[986 NYS2d 25]

Kamel R. Sadek, Appellant, v Jenkins A. Wesley et al., Respondents.

First Department, April 15, 2014

194

## APPEARANCES OF COUNSEL

*Robert A. Skoblar*, Nyack, for appellant.

*Landman Corsi Ballaine & Ford P.C.*, New York City (*Gerald T. Ford* and *Diane J. Ruccia* of counsel), for respondents.

## OPINION OF THE COURT

Saxe, J.

The question raised by this appeal is whether the trial court properly granted defendants' in limine motions and precluded plaintiff's neurological experts from testifying, on the grounds that the first expert's theory of causation was negated by a supplemental report and that the second expert's theories of causation either failed to pass the *Frye* test or were untimely

raised. We hold that the proposed testimony by plaintiff's experts should not have been precluded. The essence of these witnesses' position on causation—the unremarkable premise that the physical trauma caused by the motor vehicle collision was a competent producing cause of plaintiff's embolic stroke—did not require a formal *Frye* hearing. Moreover, even if a *Frye* hearing was appropriate, the evidence before the court was sufficient under *Frye* to avoid preclusion of the testimony.

This action arose out of a motor vehicle accident that occurred on October 2, 2006 between a limousine driven by plaintiff Kamal Sadek and a Greyhound bus operated by defendant Aaron Jenkins (sued herein as Jenkins A. Wesley). Plaintiff asserts that during the accident his head slammed against his side window. After both drivers exited their vehicles and began an angry verbal exchange, plaintiff became faint and dizzy, started to shake, and found that he needed to sit down. He then became unresponsive, and was transported to St. Luke's Roosevelt Hospital, where he was diagnosed with an embolic stroke, also called a cerebral vascular accident (CVA). A report from St. Luke's Roosevelt Hospital dated October 4, 2006 described the results of two tests performed on plaintiff: a transesophageal echocardiogram disclosed a mobile thrombus (a large blood clot) anchored to the left subclavian artery, and a magnetic resonance angiogram reportedly disclosed atheroma (plaque) in the aortic arch. Plaintiff was placed on aspirin and Plavix.

Plaintiff brought this action against the bus company and the bus driver, alleging that the accident was caused by the negligence of the driver, and that it precipitated the embolic stroke, or "aggravated, activated and/or precipitated any underlying . . . circulatory, arterial, venous or systemic condition, which was asymptomatic prior to the accident."

Plaintiff designated Dr. Nabil Yazgi as his neurological expert. His CPLR 3101 (d) notice stated that Dr. Yazgi, a neurologist who served as director of the Stroke Center at New York Presbyterian Hospital, would testify at trial in conformity with his report dated September 23, 2010. In that report, Dr. Yazgi stated that there was a "probable causal relationship" between the motor vehicle accident and the CVA.

However, in a supplemental report dated June 28, 2011, Dr. Yazgi pointed out that a medical report dated November 28, 2006, some eight weeks after the original October 4, 2006 report, stated that the thrombus and atheroma observed in the October

4, 2006 report were no longer evident. Dr. Yazgi stated that "[t]his is physiologically unlikely[,] which suggests the first report was possibly artifact,"* although he then remarked that "[a]ssuming this clot was present on the first report, trauma could feasibly have dislodged it, or a portion of it, causing an embolic stroke."

When the matter came on for trial, after the jury was empaneled on October 13, 2011, defense counsel served seven motions in limine seeking to preclude each one of plaintiff's expert witnesses: his expert on liability, his primary care physician, life care expert, lost earnings expert, speech therapist, vocational rehabilitation expert, and neurologist. After hearing argument, the trial court reserved its ruling as to the other six challenged experts, but granted the motion as to Dr. Yazgi.

The trial court reasoned that Dr. Yazgi's first report was negated by his supplemental report dated June 28, 2011 stating that there was no thrombus present on November 28, 2006, and that the supplemental report failed to sufficiently establish causation, since in it, Dr. Yazgi stated merely that trauma "could have" caused the embolic stroke. The court then granted plaintiff a four-day continuance, so that he could locate another neurologist, with the proviso that the new expert could not rely on a new theory. Plaintiff retained a second neurological expert, Dr. Sang Jin Oh, on October 20, 2011, and provided defendants with a new 3101 (d) notice stating that Dr. Oh was prepared to testify that the cause of plaintiff's embolic stroke on October 2, 2006 was the motor vehicle accident that day, and further stating that he adopted the opinion stated in Dr. Yazgi's September 23, 2010 report.

The next day, defendants challenged the use of Dr. Oh's proposed testimony, relying partly on the same ground as their challenge to Dr. Yazgi and partly on the ground that, according to their own neurological expert, Dr. Alan Segal, an embolic stroke cannot be caused by trauma and plaintiff's expert was relying on a novel theory of causation. The court granted defendants' application for a *Frye* hearing (*see Frye v United States*, 293 F 1013 [DC Cir 1923]).

In an affidavit by Dr. Oh dated November 2, 2011, supplied to counter Dr. Segal's assertion that plaintiff's theory of causation

---

* An artifact is a blemish or image in the radiograph that is not present in the roentgen image of the object (http://medical-dictionary.thefreedictionary.com/artifact).

was novel, Dr. Oh cited two studies. He reported that the results of an Israeli study, assessing potential stroke-triggering effects, including emotional stress and sudden changes in body position, indicated that in more than 20% of stroke patients studied, abrupt changes in body positions had occurred within two hours of stroke onset. The authors of the study concluded that sudden changes in body position are among the possible triggers of an embolic stroke. Dr. Oh listed nine professional journal articles that cited or discussed the study.

Dr. Oh also cited a Finnish study based on about 2,303 male volunteers over a period of 11 years that found that men who were under stress and who experienced an increase in systolic blood pressure also experienced an incremental increase (1.5% for every one point increase in systolic pressure) in their risk of having a stroke over that 11 year period. Dr. Oh indicated that a sudden spike in systolic pressure would cause damage to the outer layer of the blood vessel, causing the formation of plaque, and that if plaque buildup is already present, a spike in systolic pressure can cause plaque to rupture and emboli to break off.

At the *Frye* hearing Dr. Oh testified to the same effect, concluding within a reasonable degree of medical certainty that the accident was a competent producing cause of plaintiff's embolic stroke.

The defense emphasized that Dr. Yazgi had never referred to stress or a spike in blood pressure as factors contributing to plaintiff's stroke, and argued that Dr. Oh was offering at least four new theories of causation, namely, that plaintiff's stroke was caused by (1) a spike in blood pressure; (2) the trauma of the motor vehicle accident; (3) the "drama" resulting from the verbal altercation between plaintiff and the bus driver; and (4) plaintiff's banging his head during the accident. Defendants argued that none of these theories was identified in Dr. Yazgi's report, which had now been adopted by Dr. Oh.

At the conclusion of the *Frye* hearing, the court precluded Dr. Oh from testifying. First, the court reasoned that Dr. Oh's theory regarding two mechanisms that caused the embolus to detach, namely, an abrupt change in body movement and a spike in blood pressure, constituted new theories of causation. Second, the court held that Dr. Oh failed to show that these theories had gained general acceptance in the medical community. The court also noted that Dr. Oh suggested that the spike in blood pressure caused shearing within the vessel, which detached a piece of the thrombus, causing the embolism, but remarked that shearing was not mentioned in the relied-on studies.

The preclusion of Dr. Oh's testimony forced plaintiff to concede that he would be unable to establish a causal connection between the accident and his stroke, and since he had already withdrawn his claims for orthopedic injuries, he was left without proof of serious physical injury caused by the accident. Consequently, the court dismissed the complaint.

Discussion

At the heart of this appeal is a dispute as to whether the accident could have caused the embolic stroke plaintiff experienced. Although the trial court has broad discretion to rule on the admissibility of evidence, we agree with plaintiff that the trial court should not have granted the part of defendants' motion in limine seeking to preclude plaintiff's neurological experts from testifying, thereby preventing plaintiff from making his case.

Initially, we find that the preclusion of Dr. Yazgi's testimony was erroneous. Dr. Yazgi's assertion, in his first report, dated September 23, 2010, that there was a "probable causal relationship" between the motor vehicle accident and plaintiff's embolic stroke, citing the October 4, 2006 report from St. Luke's Roosevelt Hospital describing a mobile thrombus anchored to the left subclavian artery and plaque in the aortic arch, provided a sufficient basis for permitting him to testify as to the cause of plaintiff's embolic stroke. While Dr. Yazgi's supplemental report certainly provided grounds with which to impeach his anticipated trial testimony about where the embolus that caused the stroke had been formed, it did not absolutely invalidate Dr. Yazgi's proposed testimony regarding the cause of plaintiff's stroke; it merely created some doubt as to the initial source of the embolus.

Nor could defendants' motion properly be granted based on their other argument, namely, that Dr. Yazgi's CPLR 3101 (d) statement failed to sufficiently set forth the mechanism by which the stroke occurred. Dr. Yazgi's 3101 (d) statement with narrative report was served more than a year before trial. Defendants had the option of moving for an amplification or to require the witness to provide a more complete explication of his theory of causation (*see e.g. Mead v Dr. Rajadhyax' Dental Group*, 34 AD3d 1139 [3d Dept 2006]). Their motion in limine on the eve of trial to entirely preclude the witness on that basis was unnecessary and improper.

Moreover, the so-called mechanism of plaintiff's embolic stroke, by definition, involved some sort of clotted blood dislodg-

ing and making its way to the brain. Any uncertainty as to the exact location of the embolus before it dislodged did not invalidate the claim that it was the accident that caused it to dislodge. Defendants were free to challenge the expert's assertion that the embolus dislodged as a result of the collision, but plaintiff's right to proceed on that claim was not dependent on the expert's ability to map the exact path the embolus traveled.

■ The testimony of plaintiff's second neurological expert, Dr. Oh, also should not have been precluded. While it is appropriate for a trial court to preclude testimony setting forth an entirely new theory of causation (see *1861 Capital Master Fund, LP v Wachovia Capital Mkts., LLC*, 95 AD3d 620 [1st Dept 2012]), Dr. Oh's proposed testimony did not entirely concern a new theory. Plaintiff's theory of causation, as disclosed to defendants, had always been that the accident caused an embolus to dislodge and travel to the brain. Even accepting, for argument's sake, that Dr. Oh raised an entirely new theory by claiming that the accident caused a spike in plaintiff's blood pressure, which in turn caused the embolus to shear off, Dr. Oh was also prepared to testify that the physical trauma to plaintiff's body during the accident was a probable cause of the embolus's breaking away; to that extent his theory of causation was certainly not new.

■ We reject the trial court's determination that a *Frye* hearing was necessary. In the first place, defendants' moving papers failed to justify the need for a *Frye* hearing at all. The affidavit by defendants' expert in support of the motion merely asserted that the expert had "conducted a search of the relevant medical literature" and had found no support for plaintiff's theory that the trauma from a motor vehicle collision caused the embolic stroke. Notably, defendants' expert did not even point to literature or studies *disproving* such a link. Therefore, when, in response, plaintiff's expert provided proof that literature supporting the theory existed and had been published in reputable professional journals and cited or discussed in others, the basis for defendants' claim was negated; no factual issue was presented. At that point, it was up to the jury to decide whether to accept the assertion that the physical impact experienced by plaintiff in this accident was a competent producing cause of the embolic stroke.

Contrary to the dissent's assertion, the opinion of plaintiff's expert that the impact of the collision was a competent producing cause of the dislodgement of a clot, resulting in his stroke, is

not the type of novel theory of causation that necessitates a *Frye* hearing; it was merely an opinion explaining the physiological process that caused the stroke plaintiff suffered.

▮ Even assuming that the assertion by defendants' expert warranted an evidentiary hearing to assess the reliability of plaintiff's expert's causation claims, the evidence presented at the *Frye* hearing sufficiently established the reliability of those claims.

*Frye* hearings are used "to determine whether the experts' deductions are based on principles that are sufficiently established to have gained general acceptance as reliable" (*Marsh v Smyth*, 12 AD3d 307, 308 [1st Dept 2004]). The test is particularly useful for newly minted or experimental processes or newly posited psychological theories, in order to weed out baseless and unreliable theories; a *Frye* hearing "should be held only if the basis for the expert's conclusions is novel" (*id.* [Saxe, J., concurring]). "[W]here the proposed expert testimony concerns a claim that the plaintiff's injury was caused by the actions taken by the defendants, the whole concept of the *Frye* analysis is of limited applicability" (*id.* at 311).

As the Second Department observed in *Zito v Zabarsky* (28 AD3d 42, 44 [2d Dept 2006]), "general acceptance does not necessarily mean that a majority of the scientists involved subscribe to the conclusion. Rather it means that those espousing the theory or opinion have followed generally accepted scientific principles and methodology in evaluating clinical data to reach their conclusions." There is no need here for the consensus the dissent claims is necessary.

As was the case in *Marsh v Smyth*, the dispute here concerns the mechanism of the injury, that is, the physiological process by which the damage came to occur. In contrast to the scientific community's approach to newly developed DNA tests or polygraph tests, new processes such as posthypnotic recollection, or newly posited theories such as multiple chemical sensitivity syndrome, where the question is whether one physical event led to another physical event, it cannot be expected that numerous studies would quickly be conducted on the point (*id.* at 310-311). Therefore, the court's *Frye*-type inquiry, if any, needed only to address the "question of whether the proffered expert opinion properly relates existing data, studies or literature to the plaintiff's situation, or whether, instead, it is connected to existing data only by the *ipse dixit* of the expert" (*id.* at 312 [internal quotation marks omitted]). Plaintiff's expert showed

that the conclusion he reached, that the vehicular collision caused the dislodgement of a blood clot, leading to plaintiff's embolic stroke, was supported by a "reasonable quantum of legitimate support" (*id.*), specifically, the Israeli study assessing stroke-triggering effects of sudden changes in body position, and the professional journal articles that cite or discuss the study, thereby satisfying the requirements of *Frye*.

The dissent not only asserts that plaintiff's theory of causation is novel, and insufficiently accepted in the medical community, but, oddly, it also suggests that plaintiff's stroke could have happened before the accident, and actually caused the accident, although it fails to point to anything justifying such a suggestion. The facts themselves do not support that conclusion. Plaintiff exited from his vehicle and engaged in a verbal altercation with the driver of the bus before his stroke symptoms began to emerge. It is evident that the stroke happened within minutes *after* the accident.

In fact, the dissent's strange suggestion that plaintiff's stroke could have happened before the accident and caused the accident seems to be included more as a rhetorical device than as a real possibility. It seems to be offered as a springboard from which the dissenter can assert that he would not "presume to decide the question of whether there is a cause and effect relationship between the accident and the stroke as a matter of law." But, that is not the determination we are making. We merely hold that the causation question is one that may be decided by the jury.

The dissent also suggests that the stroke's occurrence so soon after the collision was simply coincidental, unrelated to the impact of the collision. That dubious notion does not properly counter the more likely scenario, based on the facts in the record, that the collision of the massive bus into the much smaller vehicle, with the attendant head trauma to plaintiff, physically caused the dislodging of an embolus. In any event, the defense is free to proffer that alternative scenario to the jury as well.

We must also reject the dissent's suggestion that the impact of the collision was too "minor," at too slow a rate of speed, to have caused any such injury. It should be recalled that the vehicle with which plaintiff's vehicle collided was a *37,000-pound bus*. The impact of a collision with a vehicle of that weight, even at a slow rate of speed, would be substantial. While the dissent's argument in this regard would be appropriate to make to a jury, it is not a proper basis for rejecting plaintiff's causation claim as a matter of law.

Finally, we find it troubling that defendants waited until the day the jury was empaneled to serve seven in limine motions to preclude all seven of plaintiff's expert witnesses, although the date on their motion papers indicates that they were ready to be served more than two weeks earlier. While the CPLR does not contain any time limitations applicable to in limine motions, and there are no rules about their content, there are circumstances when their use is improper (*see e.g. Downtown Art Co. v Zimmerman*, 232 AD2d 270 [1st Dept 1996]). Here, although defendants' motions were intended to be, and turned out to be, dispositive, the means by which they were presented to the court reflects an intentional avoidance of the strictures of the CPLR's notice provisions for motions. In effect, defendants' strategic decision created something akin to an ambush.

The dissent's implication that the ambush was plaintiff's own fault, for advancing a novel theory on the eve of trial, distorts the facts. It was defendants' belated, eve-of-trial motion that caused plaintiff to buttress his theory, which defendants then challenged as a new theory first offered on the eve of trial. Trial courts should take care that the informal procedure of in limine evidentiary applications is not abused so as to unfairly tip the scales.

Accordingly, the order of the Supreme Court, New York County (Eileen A. Rakower, J.), entered on or about November 3, 2011, which precluded the testimony of plaintiff's neurological expert and directed that judgment be entered dismissing the complaint, and which brings up for review an earlier ruling precluding the testimony of plaintiff's first-proposed neurological expert, should be reversed, on the law and the facts and in the exercise of discretion, without costs, and the matter restored to the trial calendar.

MOSKOWITZ, J. (concurring). I concur with the majority that the trial court improperly precluded plaintiff's experts' testimony. I part ways with the majority, however, on the necessity for a hearing in this action. I believe that the court properly held a hearing to determine whether the opinion of plaintiff's expert—that is, the opinion that the collision caused plaintiff's stroke—was based on a proper foundation.

The majority's conclusion that no *Frye* hearing was necessary rests on the notion that plaintiff need offer no expert opinion for the "unremarkable" premise that the physical trauma caused by the motor vehicle collision was a competent producing cause of plaintiff's embolic stroke. I disagree with the

majority's characterization of this premise as "unremarkable"; similarly, I disagree with the majority's premise that "no factual issue was presented." Indeed, defendants' expert, Dr. Alan Segal, stated to a reasonable degree of medical certainty that trauma from the accident was *not* a competent producing cause of plaintiff's embolic stroke and that his reading of the medical literature did not support the opinion that trauma could, in fact, cause an embolic stroke. In this context, there is no basis to simply tacitly accept, as the majority appears to do, that a sudden spike in systolic pressure could cause plaque to rupture and emboli to break off immediately after a stressful event like a car accident. Thus, given the facts of this case, a hearing was necessary to determine whether a proper foundation supported Dr. Oh's proposed opinion.

Of course, courts may, in their discretion, hold a hearing to determine whether evidence should be placed before the jury; whether the hearings are actually *Frye* hearings, or whether they are hearings held under another rubric, is of no moment (*see e.g. Parker v Mobil Oil Corp.*, 7 NY3d 434 [2006]). A hearing was particularly appropriate here given the sharp disagreement between the parties' experts as to what caused plaintiff's stroke, and given Dr. Segal's assertion that he found no support whatsoever in the medical literature for Dr. Oh's opinion. If any error existed here, it was not in holding a hearing; rather, the error, if any, was in terming the hearing a *Frye* hearing rather than simply referring to it as an evidentiary hearing or a *Parker* hearing.

Tom, J.P. (dissenting). Which came first, the accident or the stroke? The majority, deeming the etiology of an embolus to be established fact within common knowledge (*see Carter v Metro N. Assoc.*, 255 AD2d 251 [1st Dept 1998]; *Ecco High Frequency Corp. v Amtorg Trading Corp.*, 81 NYS2d 610, 617 [Sup Ct, NY County 1948], *affd* 274 App Div 982 [1st Dept 1948]), makes a daring leap of logic to construe plaintiff's theory that the accident caused the stroke as an "unremarkable premise" and to hold that Supreme Court both abused its discretion in precluding expert testimony in support of that premise and committed error in conducting a *Frye* hearing on the question of its reliability. In permitting a jury of laypersons to speculate as to the medical cause of plaintiff's stroke and decide the issue as a question of fact, the majority simply ignores *Frye* and dispenses with the analysis it requires.

At issue is whether it is generally accepted within the medical community that the trauma associated with a traffic accident—

here, a relatively minor collision—can dislodge a portion of a thrombus, causing a stroke when the ensuing embolus or emboli travel to and lodge in arteries supplying the brain, thereby blocking the flow of blood and causing tissue damage. While the mechanism of an embolic stroke is well understood, the majority never addresses the question of whether plaintiff's particular theory of causation is generally accepted, but concludes, anomalously, that the trial court erred in even conducting a *Frye* hearing (*Frye v United States*, 293 F 1013 [DC Cir 1923]). Their alternative conclusion, that, in any event, the court erred in preventing plaintiff from presenting his theory to the jury, is predicated on a single anecdotal study involving a mere 67, out of 150, largely elderly stroke patients who reported exposure to one of seven potential precipitating factors within the two hours preceding the onset of symptoms.[1] Plaintiff now conjectures that one or more of these factors may have been the cause of his stroke.

Ignoring, for the moment, the failure of plaintiff's original expert witness to identify any of the factors included in the study as the cause of plaintiff's stroke, it is axiomatic that correlation is not tantamount to causation, and a lone study does not a consensus make. The study does not establish that the particular factor identified by any participant actually caused that patient's stroke or, conversely, that the temporal proximity of the particular factor and the stroke were not merely fortuitous. More than half of the 150 stroke patients interviewed (average age 68) did *not* identify a precipitating factor. Plaintiff was only 46 years old at the time of the accident.

The majority's assertion that the conclusion of plaintiff's expert concerning the causation of plaintiff's embolic stroke was supported by a "reasonable quantum of legitimate support" is flawed. An isolated and inconclusive study suggesting that, in a minority of the patients interviewed, there was a correlation between a stroke and various possible causative factors is wholly inadequate to fulfill plaintiff's burden to demonstrate that it is *generally* accepted within the medical community that a stroke can be *caused* by a vehicular accident, such as the minor collision between the limousine plaintiff was driving and defendant's bus (*see Frye v Montefiore Med. Ctr.*, 100 AD3d 28, 38 [1st Dept 2012]; *Stanski v Ezersky*, 228 AD2d 311, 312 [1st Dept 1996], *lv denied* 89 NY2d 805 [1996]). It is alleged that as

---

1. The potential triggers included in the study were emotional stress (both positive and negative), anger, sudden posture change in response to a loud noise or other startling event, intense physical exertion, abrupt temperature change, and heavy eating.

the two vehicles were making left turns into the entrance of the Lincoln Tunnel, they came into contact causing the front of the limousine's bumper to lock with the rear bumper of the bus.

It is a plaintiff's burden to establish general acceptance of a novel theory (*Nonnon v City of New York*, 32 AD3d 91, 101 [1st Dept 2006], *affd* 9 NY3d 825 [2007]), and expert testimony will be precluded where the plaintiff fails to demonstrate that the underlying principles upon which the proffered testimony is based have gained general acceptance in the witness's particular field of expertise (*see Lara v New York City Health & Hosps. Corp.*, 305 AD2d 106 [1st Dept 2003]). Significantly, defendants' neurologist, Dr. Segal, performed a "literature search" for articles finding a relationship between embolic strokes and automobile accidents or minor trauma and was unable to locate any such article.[2] He further testified that Dr. Oh's theories— that a spike in blood pressure or stress due to the vehicles' impact could cause a piece of the thrombus to break off and travel to the brain and cause the stroke—do not exist in "literature or any kind of accepted physiology, scientific physiology that we would ever consider valid." Dr. Segal testified that there are no known "triggers" for having a piece of the thrombus break off. He was aware of the Finnish study, also referred to by plaintiff's expert, relating a spike in systolic blood pressure to increased risk of a stroke. He stated that the study demonstrated that patients who exhibited a tendency to spike their blood pressure, who were followed for 10 years, were at increased risk for having a stroke compared to patients that did not have that tendency. However, he opined that the study did not conclude that a spike in blood pressure itself directly causes a stroke. Under the circumstances, I agree with the decision of Supreme Court to preclude plaintiff from presenting a novel theory of causation to the jury (*see Price v New York City Hous. Auth.*, 92 NY2d 553, 558 [1998]). Certainly, it should not be faulted for conducting a *Frye* hearing to inform its determination (*cf. Frye v Montefiore Med. Ctr.*, 100 AD3d at 31 [opportunity to present witnesses at a *Frye* hearing declined]).

---

**2.** Remarkably, the majority accords no significance to the absence in the medical literature of any relationship between trauma and embolic strokes. Rather, it improperly shifts the burden to defendants to produce medical studies *disproving* any such relationship. Nothing in *Frye v United States* suggests that there is any affirmative burden on the opposing party to establish that a novel theory has been expressly rejected by the members of a particular field of expertise.

A second issue inexplicably avoided by the majority is that plaintiff advanced two different novel theories of causation on the eve of trial. The theory stated by his original expert was that plaintiff's stroke was brought on by the accident (by inference, and only by inference, as a result of the physical trauma experienced in the collision). The hypothesis appears as a conclusory opinion, expressed in the report of Nabil Yazgi, M.D., dated September 23, 2010, pursuant to CPLR 3101 (d), that "there is [a] probable causal relationship between the Motor Vehicle Accident of 10/2/2006 and the symptoms associated with the Cerebral Vascular Accident on 10/2/2006." The report makes no mention of the mechanism by which the stroke was induced, whether by trauma or otherwise.

Six months later, confronted with conflicting medical evidence, the doctor issued a supplemental report, resorting to rather tortuous reasoning that utterly fails to salvage his first, unsupported opinion. Dr. Yazgi's report dated June 28, 2011 concedes that two hospital vascular studies of plaintiff conducted less than two months apart are inconsistent, obliquely attributing the findings based on the earlier study to an anomaly in the radiological medium. Dr. Yazgi states that the hospital report of the first study "describes atheroma in the aortic arch and the presence of a long thrombus." Regarding the second report, the doctor states, "[T]his thrombus is not present and the aortic arch atheroma is not evident." He continues, "This is physiologically unlikely[,] which suggests the first report was possibly artifact.[3] Assuming this clot was present on the first report, trauma could feasibly have dislodged it, or a portion of it, causing an embolic stroke." Summarily stated, "Trauma could cause a CVA of unclear etiology as evidenced by the conflicting reports with regard to the vascular studies."

The opinion expressed by Dr. Yazgi is that the admittedly "unclear etiology" might conceivably be ascribed to trauma involving an *assumed* clot in the aortic arch. However, he concedes that this clot is not presently shown to exist and, assuming it ever existed, that its disappearance over a two-month period defies medical explanation. Thus, he attributes the abnormalities seen in the first study (on which his conclusion

---

**3.** "In radiology, a substance or structure not naturally present in living tissue, but of which an authentic image appears in a radiograph" (Dorland's Illustrated Medical Dictionary 162-163 [26th ed 1981]).

rests) to "artifact."

Contrary to the majority's view, Dr. Yazgi clearly acknowledged that the conclusory opinion expressed in his first report is unsupportable in light of the subsequent radiological study showing no evidence of the medical condition (a long thrombus in the aortic arch) that might have provided a foundation for his previous conclusion. The majority, like plaintiff's subsequently retained medical expert, does not attempt to portray Dr. Yazgi's second report as sufficient to state a coherent theory regarding the cause of plaintiff's injury. Rather, relying on *Mead v Dr. Rajadhyax' Dental Group* (34 AD3d 1139 [3d Dept 2006]), the majority imposes on the defense the burden to secure an exposition of such a theory of causation put forth by an expert on behalf of a plaintiff by seeking "amplification" or "a more complete explication" (*contra LaFurge v Cohen*, 61 AD3d 426 [1st Dept 2009], *lv denied* 13 NY3d 701 [2009] [untimely supplemental expert disclosure]; *see also Barksdale v New York City Tr. Auth.*, 294 AD2d 210 [1st Dept 2002] [plaintiff precluded, after defendant's motion in limine, from offering evidence at trial respecting theory of liability not set forth in notice of claim]). In *Mead*, it was the plaintiff who sought to preclude the testimony of a defense witness for failure to provide sufficiently specific information regarding a medical expert's qualifications. It is clear, however, that the Third Department based its decision on the finding that despite the belated disclosure of the defense expert's qualifications, the plaintiff was adequately informed of the defendants' theory that the injuries he sustained were the result of recognized complications of anesthesia, as listed on the consent form he had signed (*Mead*, 34 AD3d at 1141 ["In light of plaintiff's awareness of the defense theory, as well as the information gleaned from the package insert, the listing of this complication on the consent form and the testimony elicited from both experts, we find no prejudice"]).

In the matter at bar, by contrast, no coherent theory relating the stroke sustained by plaintiff to the collision involving defendant's bus was provided before the hypotheses of plaintiff's present expert witness, Sang Jin Oh, M.D., were articulated in an affidavit dated November 2, 2011. The affidavit begins by defining trauma to include both psychic as well as physical injury. While this is indeed the dictionary definition, it should be noted that nothing in the affidavits previously furnished to the defense mentions psychological trauma as a cause of

plaintiff's stroke.[4] Dr. Oh identifies two mechanisms by which the stroke could have been induced: "the sudden body movement associated with the trauma of the accident and the acute stress with the resultant spike in blood pressure associated with the trauma of the accident. Either mechanism was sufficient to detach the embolism."

Unlike the *Mead* court, the majority points to nothing in the record sufficient to apprise defendants of the theories of causation ultimately expressed by Dr. Oh on the eve of trial. Thus, the failure to timely disclose these theories was prejudicial to the defense, and it was within the sound exercise of the trial court's discretion to preclude this testimony (*see 1861 Capital Master Fund, LP v Wachovia Capital Mkts., LLC*, 95 AD3d 620 [1st Dept 2012]). While it may be, as the majority supposes, that "Dr. Oh was also prepared to testify that the physical trauma to plaintiff's body during the accident was a probable cause of the embolus's breaking away," it remains that the supporting affidavit submitted by Dr. Oh confines discussion of the potential cause of plaintiff's stroke to "sudden body movement" and "acute stress with the resultant spike in blood pressure." It is not error to issue a ruling of preclusion based on the theories actually propounded to the court by the expert.

Given that the first notice of plaintiff's theories of causation was given in Dr. Oh's affidavit dated November 2, 2011, that jury selection commenced on October 11, and that defendants served their motion to preclude Dr. Oh's testimony on October 21, the majority's expression of distress at the timing of the defense motion is difficult to fathom. It is well settled that the burden rests on the proponent of a novel theory advanced on the eve of trial to demonstrate good cause for its admission, especially where a new 3101 (d) response notices a new expert in support of the novel theory (*see Lissak v Cerabona*, 10 AD3d 308, 309-310 [1st Dept 2004]; *Kassis v Teachers Ins. & Annuity Assn.*, 258 AD2d 271 [1st Dept 1999]). Failure to meet that burden properly results in preclusion.

The effect of the majority's contrary decision is to eviscerate the *Frye* rule and permit plaintiff to present to the jury an

---

4. As previously noted, Dr. Yazgi's original affidavit of September 23, 2010, which has been adopted by Dr. Oh, is silent as to the cause of plaintiff's stroke, including trauma. Dr. Yazgi's supplemental affidavit of June 28, 2011 which, though incomprehensible, does mention trauma that "could feasibly have dislodged [a clot] or a portion of it, causing an embolic stroke," has *not* been adopted by Dr. Oh.

untested theory that has not gained acceptance in the medical community. The theory proposed by plaintiff's expert invites the jury to speculate that it was the accident that caused his stroke, without making any attempt to rule out the alternative explanation that it was a stroke that may have caused the accident. While plaintiff presents an isolated study that inconclusively supports his expert's position, the contrary proposition that a stroke impairs function and that a driver's impaired functionality is likely to cause a vehicular accident is not subject to dispute. Thus, it is equally likely that the onset of plaintiff's stroke impaired his ability to drive, resulting in the collision, and that his symptoms became more acute as the stroke progressed—to feeling faint and dizzy, starting to shake, and, finally, requiring transport to the hospital in an unresponsive state. Of course, had such a theory been advanced by the defense, it would have been equally appropriate to require expert medical testimony concerning the onset and progression of stroke symptoms and the ensuing impairment of the patient's mental and physical functions. Similarly, the court might have exercised its discretion to inquire whether the progression of stroke symptoms is generally accepted in the medical community. Unlike the majority, I do not presume to decide the question of whether there is a cause and effect relationship between the accident and the stroke as a matter of law. To the contrary, whether a particular event is generally accepted to be a factor in the onset of a medical condition is a matter that eclipses the knowledge and experience of the average jurist and warrants a *Frye* hearing to decide whether the proffered theory of causation should be presented to the trier of fact. Furthermore, if traffic accidents tend to precipitate embolic strokes, as the majority concludes, why is it, given the millions of accidents occurring annually, that plaintiff's experts have not cited any reports of such a connection in the medical literature?

What the majority ultimately fails to acknowledge is that the facts of this matter establish only a correlation—proximity in time—between the accident and the stroke, not causation sufficient to dispel the possibility that the two events are merely coincidental. Defendants are under no obligation to demonstrate that it was plaintiff's stroke that caused the accident. To recover in this action, plaintiff must establish the contrary proposition that the accident was the immediate cause of his stroke, and before he may place that proposition before the jury, he must provide a foundation for his theory by showing that it has

gained general acceptance in the medical community. This he has utterly failed to do. Thus, plaintiff has demonstrated no nonspeculative basis upon which a jury could determine that the vehicular accident of October 2, 2006 was an immediate and proximate cause of his stroke, and the complaint was correctly dismissed. As stated by the Court of Appeals in *Bernstein v City of New York* (69 NY2d 1020 [1987]), "If there are several possible causes of injury, for one or more of which defendant is not responsible, plaintiff cannot recover without proving the injury was sustained wholly or in part by a cause for which the defendant was responsible" (at 1022 [internal quotation marks omitted]; *see also Guzman v 4030 Bronx Blvd. Assoc. L.L.C.*, 54 AD3d 42 [1st Dept 2008]). Moreover, since plaintiff failed to give defendants notice of either of Dr. Oh's theories of causation until the eve of trial, his testimony was properly precluded (*1861 Capital Master Fund*, 95 AD3d at 621).

Accordingly, the order dismissing the complaint should be affirmed.

MAZZARELLI and MANZANET-DANIELS, JJ. concur with SAXE, J.; MOSKOWITZ, J., concurs in a separate opinion; TOM, J.P., dissents in a separate opinion.

Order, Supreme Court, New York County, entered on or about November 3, 2011, reversed, on the law and the facts and in the exercise of discretion, without costs, and the matter restored to the trial calendar.